IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| vs. | : | |
| | : | |
| MIGUEL MENDEZ | : | NO. 06-642-01 |

MEMORANDUM

Davis, J.                                                                                                      May 29, 2007

Defendant Miguel Mendez is charged with two counts of possession of narcotics with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Presently before the Court are Defendant's Motion to Suppress (Doc. No. 16), Government's Response in Opposition (Doc. No. 19), and Government's Supplemental Response (Doc. No. 25). The Court conducted a hearing on the matter on April 23, 2007. For the reasons set forth below, Defendant's Motion will be granted and all physical evidence resulting from the search of Defendant Mendez's vehicle shall be suppressed.

I.      FINDINGS OF FACT[1]

1.   On Saturday, May 7, 2005 at approximately 11:30pm, Philadelphia Police Highway Patrol Officers John Sykes and Peter Hale were patrolling in a semi-marked[2] police vehicle in the vicinity of Front Street and Allegheny Avenue in North Philadelphia. This is a high crime area.

2.   As the officers proceeded northbound on Front Street, they noticed a stationary black

---

[1] The Court makes the following findings by a preponderance of the evidence.

[2] According to Officer Sykes, "semi-marked" refers to a vehicle which has identifying marks painted on its sides, but its police lights are in the interior of the vehicle behind the rearview mirror, instead of on the top of the roof of the vehicle.

   four door 1997 Chevrolet Tahoe SUV that was illegally parked.[3]  The Tahoe had excessively tinted windows and was double-parked outside the New Era barbershop on Front Street, underneath a streetlight.

3. At the time, Defendant Miguel Mendez was sitting in the Tahoe waiting to get his hair cut by his barber, Eric Jones.  Jones was expecting Mendez as they had made arrangements earlier in the day, and Jones noted Mendez's arrival a few minutes earlier when Jones recognized Mendez's Tahoe pull up outside the shop as he was cutting another customer's hair.

4. It is common for barbershops in the area to have such late hours, especially on weekends.  Indeed, despite the late hour, the barbershop was busy.  There were four or five barbers working that night in the shop and approximately 20 customers waiting their turns for haircuts.

5. When the officers noticed Mendez's vehicle, they pulled up parallel to the left of, and slightly ahead of the Tahoe.  Sykes and Hale did not turn on their lights or sirens at any time as the Tahoe was already stationary, and had been for several minutes already, when they stopped alongside it.[4]  Upon seeing the police vehicle, Mendez lowered his window,

---

  [3] As a general matter, the Court does not credit several portions of Officer Sykes' testimony with regard to a number of key factual issues.  His account of the events in question was in a constant state of flux and became riddled with inexplicable gaps upon questioning.  Furthermore, his manner and demeanor during his testimony were less than straightforward and did not inspire the Court's confidence in his credibility.

  [4] The Court does not credit Sykes' testimony on this point as it was particularly inconsistent.  Initially, he claimed that he and Officer Hale initiated the stop of Defendant's vehicle: he stated that they first observed the Tahoe as it turned northbound onto Front when they were stopped at the intersection of Front and Allegheny; they then followed behind the Tahoe on Front, activating their police lights, and Mendez responded immediately by pulling over.  N.T. 11, 42-43.  Later, however, he suggested that he and Hale had turned on their lights while still at the intersection, and thus approximately one minute elapsed after the lights went on before Defendant stopped his vehicle.  N.T. 43.  Upon further questioning, Sykes testified that as they turned on their lights, Mendez had pulled out of traffic and was already coming to a stop on the side of the street.  N.T. 44.

  Furthermore, the version of events as narrated by Sykes struck this Court as incredible.  Sykes claimed although he and Hale turned on their lights to initiate a stop of the Tahoe for excessive window tinting, Hale nevertheless did not stop their police vehicle at the rear of the target vehicle as is standard police procedure but inexplicably "overshot" the Tahoe, stopping immediately adjacent to it.  Given that this encounter occurred at night in a high crime area, it is strange that two experienced police officers engaging in a routine traffic stop would disregard their training to stop in the "textbook" tactically safer position (described by Officer Sykes as ten

and the officers engaged him in conversation.

6. When the conversation began, the officers remained in their vehicle with their passenger window, speaking to Mendez through the Tahoe's open driver's window. They informed Mendez that he was illegal parked and blocking traffic. The officers then noticed that the Tahoe had excessively tinted windows.

7. Mendez recognized Sykes from a prior encounter several years ago when Sykes stopped him for driving an Oldsmobile with a cracked windshield. He remembered that he did not have a valid operator's license at the time and that despite pleading with Sykes for some 30 minutes until a tow truck arrived, Sykes ultimately impounded his vehicle.

8. Mendez remarked to Sykes that he remembered Sykes from the prior incident, but that this time he had a valid license. Mendez then proceeded to get his driver's license and vehicle registration to present to the officers. Sykes responded that he did not remember or know Mendez.

9. There is no dispute that during this exchange, Mendez's demeanor was "very calm" and that he did not appear to be at all nervous.[5] Throughout the encounter, Mendez was responsive and cooperative.

10. As Mendez collected his license and registration, Sykes and Hale exited their vehicle as it was still stopped adjacent to the Tahoe and approached the driver's door of Mendez's vehicle.[6] One of the officers opened Mendez's driver's door, and Officer Sykes removed

---

to fifteen feet to the rear of the target vehicle and slightly to the left) but instead chose to put themselves directly in the line of sight of the suspect. On this point, Defendant's account was more logically coherent and simply made better sense.

[5] The Government represented in its Response to Defendant's Motion to Suppress that Mendez "appeared extremely nervous" when Sykes asked for his license and registration. Govt.'s Resp. at 3. However, Officer Sykes' testimony unambiguously contradicted this assertion. N.T. 17.

[6] Again, the Government's explicit statement of the relevant events in its brief was expressly contradicted by Sykes' testimony: the Government stated that Sykes observed Mendez "shoving an object into the center console," Govt.'s Resp. at 1, however Sykes testified that he was not able to see Mendez's hands at all from outside the vehicle, N.T. 52.

Regardless, the Court is unpersuaded by Sykes' narrative. Officer Sykes claimed that as soon as his partner stopped adjacent to Mendez's vehicle, he exited his vehicle at around the front left fender of the Tahoe. N.T. 45. After exiting, he stated that he first walked passed the driver's window to the rear driver's side passenger door of the Tahoe in order to get in the tactically correct traffic stop position, at which point he then turned to walk back towards the driver's window. N.T. 45-49. Sykes testified that some time during these seconds when he was

      Mendez from the vehicle as Mendez gave his license and registration to him. Sykes then frisked Mendez, and as Hale remained with Mendez near the back passenger door of the Tahoe, Sykes proceeded to search the interior of the vehicle. No weapon was found on Defendant's person or in the vehicle.

11.     In the center console, Sykes found two identical rectangular packages wrapped in newspaper. Each was approximately nine inches long, two inches wide and an inch and a half deep. These packages were discovered deep inside the center console, underneath a removable storage tray, and their newspaper wrappings were intact.[7] These packages were ultimately determined to contain glassine packets containing heroin. In the rear passenger compartment, Sykes found a brick-like object wrapped in a black plastic bag, which was later determined to contain cocaine.

12.     Sykes seized the narcotics and placed Mendez under arrest. Hale issued a citation to Mendez for illegal window tinting.

II.     CONCLUSIONS OF LAW

      It is settled law that where a police officer observes a violation of state traffic laws, he may lawfully stop the vehicle. Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977); United States

---

walking back and forth next to the Tahoe, Defendant kept the window up, but that he nevertheless observed Defendant's silhouette lean towards the center of the vehicle and engage in up and down "shrugging" movements of the shoulders such that it caused the SUV to rock for close to eight seconds. N.T. 48-53. It is not clear however, despite repeated questioning what movements he observed at what point. Furthermore, during cross-examination and questioning by the Court, Sykes' manner was less than forthright and his responses were at times internally inconsistent. In short, the Government has not established by a preponderance to the Court that Sykes witnessed any suspicious movements by Mendez while walking outside the Tahoe or that the alleged "shrugging" and leaning movements as described were such that would have caused the full-size SUV in question to rock for an extended period of time. Indeed, the Court takes judicial notice that a 1997 four door Chevrolet Tahoe SUV weighs approximately 3.4 tons (6,800 pounds). See Fed. R. Evid. 201(b) (matters of public record that are generally known and capable of accurate and ready determination are subject to judicial notice).

    [7] In particular, Sykes claims that the wrapping of one of the rectangular packages happened to be torn at the corner such that the "tips of three packets [of heroin] were hanging out," N.T. 63, and thus he was immediately able to identify the packages as containing heroin. However, based on Sykes' manner and demeanor when he was questioned about these specific observations by the Court, this Court finds Sykes' account that one of the packages was partially torn to be completely incredible.

v. Bonner, 363 F.3d 213, 216 (3d Cir. 2004).  Such stops are akin to seizures under Terry v. Ohio, and are generally reasonable as long they are temporary in duration and "last no longer than is necessary to effectuate the purpose of the stop."  Florida v. Royer, 460 U.S. 491, 500 (1983).

In the course of an ordinary traffic stop, police may order the driver out of the vehicle without any particularized suspicion.  Mimms, 434 U.S. at 110-11.  Where police develop reasonable suspicion that a temporarily seized individual is armed and dangerous, they may lawfully frisk that individual for weapons.  Terry v. Ohio, 392 U.S. 1, 27 (1968).  Similarly, where a police officer possesses a "reasonable belief, based on specific and articulable facts which, taken together with the rational inferences from those facts" that the individual is dangerous and may gain immediate control of weapons, he may conduct a search of the passenger compartment of the individual's vehicle.  Michigan v. Long, 463 U.S. 1032, 1049 (1983); see also Minnesota v. Dickerson, 508 U.S. 366, 375-76 (1993) (police may seize contraband during Terry protective search for weapons only if it is "immediately apparent" that item is contraband).  The key inquiry is whether under a totality of the circumstances, a reasonably prudent officer would be warranted in believing that his safety or that of others was in danger.  Terry, 392 U.S. at 27; United States v. Edwards, 53 F.3d 616, 618 (3d Cir. 1995).

Here, Defendant does not challenge that Officer Sykes was justified in initiating their encounter as his vehicle was undisputedly at the time illegally parked and excessively tinted in violation of Pennsylvania law.  Rather, Defendant argues that Officer Sykes' escalation of the stop and the ensuing search of his vehicle violated his Fourth Amendment rights because Sykes lacked reasonable suspicion to believe he was armed and dangerous.  However, the Government

contends that Mendez was operating a vehicle with illegally tinted windows in a high crime area, coupled with Sykes' alleged observations of Mendez's "panic[ked]," "frantic" and "scrambling" movements inside his vehicle, were sufficient to justify the frisk and subsequent vehicle search. Govt.'s Resp. at 6; Govt.'s Supp. Brief at 2, 5.  Regardless, as the Court has already made the factual determination that Officer Sykes did not observe any suspicious movements by Mendez, that last alleged factor will play no role in this Court's totality of the circumstances inquiry. Therefore, the only question is whether (1) that Defendant was found late on a Saturday night (2) in a vehicle with excessively tinted windows (3) in a neighborhood known for a high incidence of crime is sufficient to warrant a reasonable officer to fear for his safety.  The Court answers this question in the negative.

      The Government has failed to carry its burden.  See United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (government bears burden of establishing reasonableness of warrantless search).  At the outset, it should be noted that in order to uphold the frisk and vehicle search, Officer Sykes needed to have not just a reasonable suspicion that some criminal activity was afoot, but a reasonable belief that Mendez was dangerous and might gain immediate access to weapons.  See Long, 463 U.S. at 1049; United States v. Austin, 269 F. Supp. 2d 629, 632 (E.D. Pa. 2003).  Mere presence in a high crime area, however, without more, does not constitute reasonable suspicion of criminal activity.  Brown v. Texas, 443 U.S. 47, 52 (1979); Bonner, 363 F.3d at 217.  Nor could one's presence in such a neighborhood, standing alone, support a belief that he is likely to be armed.

      Similarly, operating a car with illegally tinted windows also fails to arise to the requisite reasonable suspicion.  See United States v. Brown, 334 F.3d 1161, 1178 (D.C. Cir. 2003)

("obscured vision due to the black car's tinted windows [] does not relieve the police of their obligations under Terry"); Whitfield v. Bd. of County Comm'rs of Eagle County, 837 F. Supp. 338, 344 (D. Colo. 1993) ("[t]inted windows keep out the sun, as well as the prying looks of others; and neither function indicates that a car's occupants are not law abiding").  Certainly, that one's windows are darkly tinted may be a relevant factor in justifying a protective search where it is accompanied by other specific and articulable suspicious or unusual indicia particular to the suspect.  See United States v. Stanfield, 109 F.3d 976, 984 (4th Cir. 1997) (protective search justified where defendant's vehicle with tinted windows was stopped illegally parked in early morning in deserted part of town known for drugs and defendant was observed immediately prior conversing with a known drug dealer); United States v. Thomas, 363 F. Supp. 2d 84, 91-92 (D. Conn. 2005) (reasonable suspicion for frisk existed where police responded to complaint about loud music from a car late at night in an area known for drugs, the car was a rental and had darkly tinted windows, one occupant gave a suspicious explanation for his presence in the area, both occupants were nervous when asked to step out of the car, and defendant made nervous hand movements).  While "[i]t is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt," the officer must ultimately act on "facts directly relating to the suspect or the suspect's conduct and not just on a 'hunch'" or on generalizations.  United States v. Campbell, 843 F.2d 1089, 1093-94 (8th Cir. 1988); see also United States v. Hall, 193 Fed. Appx. 125, 130 (3d Cir. July 17, 2006) (citing Campbell, 843 F.2d at 1093-94).

  Even putting together the tinted windows with the presence in a high crime area, the Government still falls short of establishing the requisite justification for Officer Sykes' search;

7

other than these generalized circumstances which may very well apply to a good number of wholly innocent individuals, there were no credible specific and articulable observations particular to Mendez which would have supported a reasonable belief that he was armed. Indeed, in the instant case, much of concern pertaining to the increased dangerousness for police officers when approaching a vehicle with illegally darkened windows was simply not present as Mendez in fact lowered his tinted windows upon seeing the officers.  See Brown, 334 F.3d at 1178 (noting that police may be "[a]t best" justified in using more caution in conducting Terry stop when vehicle's window tinting obscured the officer's vision, but the tinting itself did not provide reasonable suspicion).  Under the circumstances of this case, although Sykes' encounter with Mendez occurred late at night in an area known for narcotics and weapons, where the initial seizure occurred in front of a busy barbershop, Mendez lowered his tinted windows upon seeing the police vehicle, was "very calm" in his exchange with the officers, and expediently produced his license and registration, the Court concludes that Sykes did not have any basis upon which to form a reasonable belief that Mendez was armed and dangerous.  Therefore, the search of Defendant's vehicle was unreasonable under the Fourth Amendment, and all physical evidence resulting from this unlawful search must be suppressed.  An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| vs. | : | |
| | : | |
| MIGUEL MENDEZ | : | NO. 06-642-01 |

### ORDER

AND NOW, this 29th day of May 2007, upon consideration of Defendant's Motion to Suppress (Doc. No. 16), Government's Response in Opposition (Doc. No. 19), and Government's Supplemental Response (Doc. No. 25), it is hereby ORDERED that Defendant's Motion is GRANTED and all physical evidence derived from the May 7, 2005 unlawful search of Defendant's vehicle shall be suppressed.

BY THE COURT:

/s/ Legrome Davis
Legrome D. Davis, J.